Joel Wade **FRAZIER** et al.

v.

Thomas F. **DONELON** et al.

Civ. A. No. 72–814.

United States District Court,
E. D. Louisiana.

Aug. 23, 1974.

William D. Treeby, and Michael R. Fontham, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for plaintiffs.

Alvin R. Eason, Parish Atty., Robert I. Broussard, Lionel R. Collins, Asst. Parish Attys., Gretna, La., for defendants, President of the Parish of Jefferson and Councilmen of the Parish of Jefferson, Louisiana.

Russell J. Schonekas, Tucker & Schonekas, New Orleans, La., for defendants, Alwynn J. Cronvich. Sheriff of the Parish of Jefferson, and Roland J. Vicknair, Warden of the Jefferson Parish Prison.

JACK M. GORDON, District Judge:

Plaintiffs, on behalf of themselves and other inmates of the Jefferson Parish Prison, instituted this action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343,[1] against Thomas F. Donelon, the President of Jefferson Parish, Louisiana; all councilmen of Jefferson Parish;[2] Alwynn J. Cronvich, the Sheriff of Jefferson Parish; and Roland J. Vicknair, the Warden of Jefferson Parish Prison. In their complaint, plaintiffs challenge a number of the practices, rules, and regulations of the Jefferson Parish Jail as constitutionally violative of the First, Sixth, and Fourteenth Amendments.

Plaintiffs maintain that certain illegal procedures are in operation at Jefferson Parish Jail and accordingly, plaintiffs

---

1. Title 42, United States Code, Section 1983 reads as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

Title 28, United States Code, Section 1343 reads in pertinent part as follows:

The District Courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\*　　\*　　\*　　\*　　\*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . .

2. The defendant president and councilmanic members of Jefferson Parish filed a motion to dismiss prior to trial; this motion was unopposed by plaintiffs and accordingly was granted by the Court.

contest these procedures as enumerated in the following allegations: (1) prison officials assert the right to open, inspect, read, and censor all correspondence to and from prison inmates; (2) prison officials sometimes refuse to mail inmate correspondence containing complaints about prison conditions; (3) mail arriving at the prison occasionally is delayed without reason; (4) visiting hours for inmates are limited arbitrarily and the present visiting facilities are substantially inadequate; (5) visiting regulations are applied in a discriminatory fashion; (6) usage of the public telephone is denied capriciously to some inmates; (7) inmates are not allowed access to newspapers, books, magazines, and other publications; (8) many inmates arbitrarily are denied the right to attend religious services conducted in the institution; and (9) prisoners have been refused the right to designate spokesmen to inform prison officials of the complaints of the inmate populace.

Generally speaking, the federal courts have adhered to the tenet of not interfering in the internal affairs and the administration of correctional systems, except in those extraordinary instances when the available administrative remedies within the penal system are of no avail to its inmate inhabitants. *See* Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Robinson v. Jordan, 494 F.2d 793 (5th Cir. 1974); Granville v. Hunt, 411 F.2d 9 (5th Cir. 1969); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968). *Cf.,* Haggerty v. Wainwright, 427 F.2d 1137 (5th Cir. 1970); Eaton v. Capps, 348 F.Supp. 237 (M.D.Ala.1972), aff'd, 480 F.2d 1021 (5th Cir. 1973). This non-intervention approach by the courts stems principally from judicial recognition of the sui generis nature of problems inherent in the formulation and execution of policies in a correctional environment. A complementary supportive factor in the development of judicial restraint with respect to the correctional area is the reticence of the federal courts to administer the functions of state institutions. Management of state penal institutions should at the very least be deferred to state courts and at the very best to the appropriate prison authorities. *See,* Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

The tasks that administrators of penal facilities perform are not easy or envy-engendering ones; these responsibilities include, inter alia, the maintenance of frequently overcrowded institutions, the preservation of internal order and discipline, guarding against escape and preventing the infiltration of various contraband, such as weapons and narcotics, all without infringing the personal rights of the inmates. It is not very surprising, therefore, that problems surrounding incarceration are complicated and usually are not susceptible of ready resolutions. Accordingly, extensive research, planning, and expertise in correctional affairs must be employed when attempting to discover viable solutions. It would not seriously be questioned that the courts, vis-à-vis other branches of government, are the least equipped governmental organ through which to ventilate and resolve inmate grievances because inherent in the juridical operation is the necessity that courts view each issue in black and white terms. By its very nature, a court's ruling is antithetical to the attainment of striking a judicious medium between the parties. Cognizant of the undesirable result produced by such a "one or the other" approach when dealing with inmate assaults upon the regulations of correctional institutions, this Court attempted to avoid resolution of the present complaint by judicial fiat. It is the opinion of this Court that resolution of disputes by litigation, due to the combatant win or lose attitude of litigants, generally has the effect of driving the parties further apart instead of bringing them together. Thus, the Court preferred to yield to the less stultified process whereby judicial involvement in correctional problems hopefully would be eliminated or perhaps minimized substantially.

Consistent with the above stated philosophy of avoiding, when possible, a tripartite confrontation between the inmates, the prison administrators, and the judiciary, this Court concluded that a non-judicial remedial system for inmate grievances would constitute a more preferable approach. Therefore, the Court sought to employ some means whereby the inmates and the administrators could negotiate the complaints in the instant case without judicial interference but subject to court review if warranted. Such a negotiating structure must be both flexible in its operation and independent of the system that it seeks to modify.

As would be expected, this form of collective bargaining also requires the presence of some impartial individual or agency, trained as a mediator, who can assist the parties in the creation of a suitable format. Not only must this neutral consultant be able to delineate to the respective sides the sundry, conflicting interests and needs of their bargaining opponent, but the mediator must be able to serve as the necessary catalyst in helping the parties develop possible solutions to their mutual problems.

Inasmuch as collective bargaining within the correctional parameters is a relatively novel approach which many persons, including judges, still consider to be in an embryonic stage, the Court felt that it would be instructive to detail the fundamentals of the negotiating system that the Court employed in this case, and, more particularly, how such a system developed and functioned.

Initially, the Court informally requested the parties to the suit at bar to agree to keep the litigation in abeyance while the mediation progressed, in recognition of the fact that litigation is often incongruous with the forward movement of mediation. The litigants voluntarily consented to the unrecorded stay order and concurred with the Court in its desire to provide an alternative remedy to the judicial process. Of course, the first task was to select a competent mediator. The usage of the Community Relations Service (hereinafter referred to as "CRS"), a division of the United States Department of Justice, proved most formidably to satisfy this need. After contacting the Regional Coordinator of the CRS, arrangements were made whereby the Court personally explained to the CRS representative the existing issues of conflict. As an aside, the CRS representative informed the Court that the CRS had prior experience in mediating inmate grievances and recently had achieved success in performing mediation services in a nearby state correctional institution. Once the CRS representative understood the inmate grievances, the Court scheduled a conference in chambers with the CRS representative, the attorneys for the inmates, the Sheriff of Jefferson Parish, the Warden of Jefferson Parish Prison, as well as their attorneys. From that juncture until the completion of the arbitration processes, the Court's involvement was strictly de minimis. During the Court's conference the CRS representative presented some tentative ground rules for the forthcoming discussions and posed a plan for the selection of members of the respective negotiating teams. The inmate body of Jefferson Parish Prison designated their bargaining agents,[3] which included the inmates' counsel, while the so-called prison management side consisted of the Sheriff, the Warden, various correctional officials, and attorneys for the Parish.

Upon the selection of the negotiating committees, the CRS representative secured a meeting place where the discussions could occur with a substantial degree of privacy. These sessions were scheduled so as to allow an adequate amount of time for each conference as well as to permit ample time between

3. The prison team and management team selected alternates. As would be expected, the jail population has a quick turnover due to the fact that it is used as a holding place for inmates who are scheduled to be transferred to penitentiaries or for those convicted individuals who are sentenced to a relatively brief period of incarceration.

sessions; the parties thus had sufficient time to fully air their views at each encounter and concomitantly enjoyed enough time between sessions to digest the conversations and results of the previous session as well as to obtain feedback on the different issues from their respective represented bodies.

As reported to the Court by the CRS representative, the negotiating meetings were highly productive. Although these sessions were intended to focus on the inmate grievances contained in the complaint, the parties were not limited in their discussions to any specific boundaries. In a remarkably short time, a certain camaraderie between the two factions surfaced and soon thereafter concrete compromises were perfected on a plurality of the issues that were in dispute. The fruits of these mediation sessions culminated in a binding agreement entered into by the parties on the following matters: access to religious services; public telephone service; grievance procedure; and visiting privileges. For illustrative purposes, the Court has appended to its opinion (identified as Appendix A) the final settlement agreement between the prison authorities and the inmates. In addition to the formal agreements, the Court clearly appreciates certain fringe benefits that resulted from this series of negotiations; among these valuable extras are a higher level of rapport between the authorities and the inmates, and, of no small import, the indoctrination of mediation to both sides as a potentially viable and permanent alternative to the courts in resolving the complaints of inmates.

Due to the mediation discussions, only the following two contested issues remained: the right of the prison authorities to open, inspect, read, and censor prisoner correspondence[4] and the inmates' accessibility or lack thereof to reading materials. Since the parties were unable to reach a compromise on

this pair of issues, the Court scheduled this portion of the case to be tried. Having heard the testimony of the principal protagonists and a number of interested parties, equally representing the views of the correctional authorities and the inmates, supplemented by the legal memoranda submitted by counsel, the Court is prepared to rule and to outline the procedures that should be implemented with respect to prisoner correspondence and inmate access to reading matter.

The inmate plaintiffs contend that the perusal and periodical censorship of their mail coupled with the alleged curtailment of inmate reading material abridge their rights protected by the First, Sixth and Fourteenth Amendments to the United States Constitution. Specifically, the inmates argue that the actions of the prison officials infringe upon the inmates' rights of free speech and personal privacy and impair free access by the inmates to the courts and to counsel. The prison authorities, quite naturally, defend the contested restrictions as appropriate means through which certain penal objectives can be achieved. Of paramount concern among the administrators' goals are the maintenance of security and inmate discipline.

At the outset, it is incumbent upon the Court to state certain findings of fact garnered from the testimony during trial. With respect to prisoner correspondence, the normal routine of distribution of mail can be capsulized as follows: all incoming mail is initially routed to the Sheriff's office, situated within the institution, where a member of his staff inspects the mail to filter out any contraband of weapons, narcotics, or currency. Incoming mail is subject to being read, but, as a practical matter, the staff member only intermittently reads a few letters, randomly selected, to serve as a spot check. The Warden testified that the incoming mail of inmates,

---

4. In the pre-trial order submitted to the Court, the parties stipulated to the fact that all incoming and outgoing inmate mail is subject to being opened, inspected, read and censored. This practice was confirmed by the testimony elicited during trial.

who are considered by the authorities to pose security risks, is regularly read as a safety precaution.[5] Outgoing mail is collected daily from the inmates and likewise is subject to being read and censored by the Warden or his Chief Deputy. Objectionable outgoing mail is returned to the author or may be mailed once the offensive portions are deleted. The inmates contend, but the Court found no credible evidence to support the fact, that some prison guards, without authorization, occasionally read mail written by the inmates.

At trial, the Court also learned that written correspondence is not the only means of communication by an inmate. Alternative channels of communication are available and these include use of the public telephones and visitation privileges with family, friends, and legal counsel. As previously indicated, these alternative means of communication substantially have been improved, both quantitatively and qualitatively, due to the recent mediation efforts.

The availability of reading material to the inmates is a considerably narrow issue. After hearing all of the testimony, this Court has only been able to discern two complaints and each is very specific in nature. The first focuses on the termination of the gratuitous distribution among inmates of the local morning newspaper. A newspaper dealer previously had been donating extra copies to the Jail provided someone from the Jail picked up the newspapers each morning. For purely budgetary reasons, that is, the increased cost of. sending someone to collect the free newspapers, the administrators discontinued this service. Parenthetically, the authorities did express in open court that they would attempt to renew this service to the inmates as soon as the necessary fis-

cal arrangements could be completed. It is significant to note that at no time did the temporary stoppage of free newspapers impair the right of the inmates to subscribe, at their cost, to the local newspaper or to any other news journal.

The second inmate complaint is founded on certain limitations of inmate reading matter imposed by the Jail authorities. Although a number of former and present inmates testified, the only prohibited periodical that could be identified was Playboy Magazine.[6] The authorities responded that their policy of screening out all prurient literature is predicated on the belief that sexually stimulating reading matter has a tendency to disrupt the internal discipline of a penal institution; the correctional authorities reported to the Court that written descriptions and pictorial displays of nudity and simulated sexual acts constitute valuable contraband within the prison culture, and consequently, possession of these items frequently becomes a source of inmate competition and agitation.

██ Beginning its restricted evaluation of correctional policies, the Court, in formulating its views, acknowledges the oft-repeated, though less heeded, principle that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). *Accord,* Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Jones v. Connors, 496 F.2d 82 (5th Cir. 1974); United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3rd Cir. 1973). *See also,* Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Brown v. Wainwright, 419

---

5. Jefferson Parish Jail authorities related to the Court some of the ingenious methods that inmate correspondents have employed in their attempts to convey contraband to the inmates; for example, contraband has been discovered by the authorities under postage stamps, on the glue of envelopes, and sand-

wiched between a photograph and its cardboard backing.

6. It is germane to this criticism to recognize that a prison library, containing a variety of books and magazines, is available to the inmates in addition to any private subscriptions of periodicals.

F.2d 1376 (5th Cir. 1970). Although incarceration of an individual may require the circumscription and deprivation of certain rights afforded to his or her free counterpart, this is not to suggest that one is stripped of all constitutional guarantees upon passing through the prison portals. Rather, an inmate maintains those constitutional protections that are not at variance with the needs and objectives of the correctional facility.[7]

The inmate plaintiffs asseverate that their rights under the First, Sixth, and Fourteenth Amendments should not be one scintilla less than those of citizens who are not behind bars. Adhering to the procedure recently followed by the Supreme Court in a similar factual context, *see* Procunier v. Martinez, *supra,* this Court elects to resort to a narrower basis for decision instead of resolving the whole gamut of prisoners' rights. In *Procunier,* the Supreme Court recognized that two factions, the inmates and

"those who have a particularized interest in communicating" with the inmates, have an interest in securing written communication free of censorship. Whether sender or recipient, an inmate's correspondent suffers an infringement of his or her First and Fourteenth Amendment rights when the correctional authorities choose to censor prison mail, albeit that such a constitutional abridgement is merely an unintentional by-product of a superficially licit administrative function. Unlike *Procunier,* this Court need not decide the validity of specific penal regulations controlling correspondence; however, not unlike *Procunier,* this Court must determine if the mail policies at Jefferson Parish Jail constitute a proper standard of review.[8]

 Paralleling the guidelines opined by the Supreme Court in *Procunier,* this Court approves of the Jefferson Parish Prison administrators' regulation of inmate mail provided the authorities demonstrate that any mail re-

---

7. *See, e. g.,* Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Cruz v. Beto, *supra*; Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970), aff'd, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Ross v. Blackledge, 477 F.2d 616 (4th Cir. 1973); Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971); Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Cal.1972).

8. It does not appear to the Court that any well-defined written regulations currently exist governing the correspondence of inmates in Jefferson Parish Prison. Clearly the Court could not and would not uphold such a nebulous degree of personal latitude on the part of the authorities caused by the lack of specific rules. However, in keeping with this Court's philosophy of minimizing the extent of judicial intervention in correctional affairs, the Court will defer to the parties the responsibility of formulating the permissible standards through which inmate mail can be regulated. These standards should closely conform to the guidelines described in this opinion. Though not suggesting that the parties adopt verbatim the mail policy of the Federal Bureau of Prisons, the recitation of the federal criteria may prove helpful. Policy Statement 7300.1A of the Federal Bureau of Prisons prohibits the following material in inmate correspondence:

(1) Any material which might violate postal regulations, i. e., threats, blackmail, contraband or which indicate plots of escape.

(2) Discussion of criminal activities.

(3) No inmate may be permitted to conduct his business while he is in confinement. This does not go to the point of prohibiting correspondence necessary to enable the inmate to protect the property and funds that were legitimately his at the time he was committed to the institution. Thus, an inmate could correspond about refinancing a mortgage on his home or sign insurance papers, but he could not operate a mortgage or insurance business while in the institution.

(4) Letters containing codes or other obvious attempts to circumvent these regulations will be subject to rejection.

(5) Insofar as possible, all letters shall be written in English, but every effort should be made to accommodate those inmates who are unable to write in English or whose correspondents would be unable to understand a letter written in English. The criminal sophistication of the inmate, the relationship of the inmate and the correspondent are factors to be considered in deciding whether correspondence in a foreign language should be permitted.

strictions are justifiable and that implementation of these restrictions necessitates a minimum degree of discretion. To justify mail censorship, the authorities must establish that the regulation at issue furthers a substantial governmental interest, such as security and discipline within the correctional institution, and that the questioned provision is worded so as to minimize any resulting constitutional transgressions. Hence, regulations involving inmate correspondence cannot be promulgated for self-serving purposes, that is, to suppress uncomplimentary, defamatory or critical language contained in the letters. Nor can the enumerated exceptions of over-riding interest be identified in such ambiguous terms that they encourage unbridled discretion in their application by the authorities.

■ As previously mentioned, censorship of inmate correspondence has a dual effect—it concerns the inmate as well as the inmate's correspondent. Therefore, once the authorities decide to censor major portions of a letter or to reject in toto the letter, minimal procedural safeguards should attach, and it does not seem unreasonable that the authorities notify the sender of this decision with an accompanying explanation for their action. Moreover, if the author believes that his or her product is outside the pale of the restrictions, then the writer should have available some avenue of review.

■ Implicit in the Court's above discussion regarding the censorship of inmate correspondence is the entitlement of jail authorities to open and read most incoming and outgoing inmate mail. *See,* Wolff v. McDonnell, 418 U.S. at 574–577, 94 S.Ct. at 2984–2985. To summarize briefly, the exigencies in the operation of a penal institution dictate the loss or minimal deterioration of certain constitutional rights during confinement, inter alia, the right to mail letters uninspected and unread by a third party. It is axiomatic that a cursory inspection of the envelope and the contents therein is justified in order to prevent the flow of contraband weapons and narcotics and to detect possible escape plans. This result is consistent with the formula earlier stated by the Court whereby the particular societal interests are measured against the particular regulation at bar.

■ The second phase of the plaintiffs' attack on the mail regulations is directed to inmate correspondence to the courts and to attorneys. Plaintiffs argue that restrictions on written correspondence with members of these two groups violates the First Amendment (freedom of speech), the Sixth Amendment (attorney-client relationship), and the Fourteenth Amendment (access to the courts). With respect to the First Amendment issue, this Court reiterates its refusal to broaden First Amendment rights inside a penal institution in light of controlling governmental interest, especially when higher courts unmistakably have endorsed the same approach. *See,* Wolff v. McDonnell, *supra;* Procunier v. Martinez, *supra.* The Sixth [9] and Fourteenth [10] Amendments do appear to conflict directly with the present restrictions that condone indiscriminate reading of inmate correspondence to and from attorneys and judicial officers. The Court must strike a balance that will accommodate the constitutional guarantees of the inmates while concurrently recognizing the need to preserve internal security. Bearing in mind this goal, the Court proffers the following guideposts. All incoming mail marked as originating from a judge or court personnel should be opened in the pres-

9. It is important to recognize that the basis of a Sixth Amendment consideration is strictly to protect the relationship of attorney and client in criminal matters, although if the Court grants relief pursuant to this argument, the net effect would protect all written correspondence between attorney of record and client.

10. *See e. g.,* Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) ; Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).

ence of the inmate or of an inmate representative to determine if contraband is enclosed. The correspondence then should be delivered to the addressee absent unreasonable delay; prison authorities should not read this mail.[11] Outgoing mail to the courts should not be opened or read. It should be visibly marked as inmate correspondence and placed in the mail.[12] Correspondence from attorneys should be afforded the same procedural privilege as the mail from the courts except that as a condition precedent to the initiation of this privilege of unfettered correspondence the attorney should be obligated to communicate to the jail authorities the existence of an attorney-client relationship with the designated inmate and counsel's name and address. Similarly, if an attorney's name and address has been listed with the authorities then the authorities only should identify the origin of the outgoing mail to that attorney—nothing else. Otherwise, correspondence between an inmate and an attorney should be treated as normal personal correspondence with the authorities' concomitant rights to inspect and read the contents.

■ The controversy over inmate reading material is the second of two remaining issues post mediation. The problem can be subdivided into the inmates' contention that they are entitled to receive any periodical, including Playboy Magazine, and that the authorities

improperly have terminated the distribution of free local newspapers. Starting with the latter complaint, the Court previously has stated that financial difficulties of the Jefferson Parish Prison caused discontinuance of the newspaper service. However, the inability to deliver free tabloids in no way affected the inmates' option to subscribe to the newspaper. Such a grievance definitely cannot activate First Amendment or other constitutional protections and its ultimate resolution should rest with the prison authorities. *See,* Jones v. Connors, *supra.*

■ It is somewhat difficult for the Court to address itself to the inmates' complaint that they are prohibited from receiving certain publications since both their allegation and the related testimony are considerably vague on this averment. Despite the Court's belief that the inmates' asserted *right* to read Playboy Magazine borders on frivolity,[13] the Court has concluded that the authorities have demonstrated that the interests of internal order and discipline require suppression of Playboy Magazine and other periodicals with similar sexual formats. Plaintiffs have been unable to prove any arbitrariness or capriciousness on the part of the defendant authorities in the suppression of this magazine. Should the inmates decide to challenge subsequent reading bans, then it likewise is obligatory upon the authorities to justify these particularized

---

11. *Accord,* Adams v. Carlson, 488 F.2d 619 (7th Cir. 1973) ; Smith v. Robbins, 454 F.2d 696 (1st. Cir. 1972).

The record in the instant case reflects that approximately thirty to forty letters are received daily at Jefferson Parish Prison. This influx of mail includes personal correspondence and mail from courts and counsel. The Court thus believes that this procedure could be executed quickly and efficiently and that such a format would not unduly burden the administration of the institution.

12. Exemplary of this concept is the Federal Bureau of Prisons policy which stamps on prisoner mail the following language:

Federal Correctional Institution
(Location of Institution)
Date ————
The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

13. *See,* Kaufman, Prison: The Judge's Dilemma, 41 Fordham L.Rev. 495 (1973).

restriction.[14] *See,* Jackson v. Godwin, *supra; see* generally, Royal v. Clark, 447 F.2d 501 (5th Cir. 1971); Northern v. Nelson, 315 F.Supp. 687 (N.D.Cal.1970), aff'd, 448 F.2d 1266 (9th Cir. 1971).

Accordingly,

It is ordered that the defendant, Sheriff Alwynn J. Cronvich, shall formulate new regulations governing inmate mail in accordance with this opinion, and serve the proposed regulations on plaintiffs' counsel and concurrently file them with the Court on or before October 1, 1974. Plaintiffs shall have until October 10, 1974, to respond to these submitted regulations. Meanwhile, this Court reserves jurisdiction of this lawsuit until properly formulated regulations have received this Court's approval.

## APPENDIX A

### FINAL SETTLEMENT AGREEMENT
### BETWEEN NEGOTIATING TEAMS FOR
### THE JEFFERSON PARISH/LOUISIANA PRISON AUTHORITY
### AND REPRESENTATIVE PRISON INMATES

New Orleans, Louisiana                    June 27, 1973

The following is agreed between the undersigned parties:

I.  ACCESS TO RELIGIOUS SERVICES

    A.  The Catholic and Protestant prison chaplains will be expected to inform inmates, and particularly new arrivals, as to the time, place, and day denominational religious services are to be available.

    B.  Each Sunday, or whatever other day may be set aside for such services (i. e. special holidays), at approximately thirty minutes before the scheduled time to begin, announcement on the public address system will be made for the purpose of: 1) alerting inmates to be ready to proceed to the appointed place if they choose to go; 2) notifying the hall boys to circulate the call-out list. Those who indicate a desire to attend services will affix their names to a call-out list made available by the hall boy.

A second announcement on the public address system will be made approximately fifteen minutes before the scheduled time for services to begin. This final reminder is designed to help assure that all who wish to attend services are aware of the hour and can be prepared to leave promptly when called.

Those inmates who have signed the call-out list will be called forth by a prison guard or other official when it is time to depart. Any inmate who fails to respond will be passed over and called again after the list is completed. Any inmate who had signed the call-out list and then declines to go, or fails

---

14. Application of this rule must be done against the backdrop of the well-settled doctrine that control of prison mail is generally a matter within the scope of the prison administrators' discretion and good faith. *See* Brown v. Wainwright, *supra;* Comment, Prison Mail Censorship and the First Amendment, 81 Yale L.J. 87 (1971).

to respond on time, shall have his name lined out and the opportunity to initial the change. If the inmate declines to initial the change, an appropriate note to that effect shall be entered by the hall boy.

C.  Each inmate will be entitled to attend one denominational service of his choice on any given day on which the services are made available. The aforementioned call-out list will be used to provide a record of attendees and to assure that no inmate attends more than the one service to which he is entitled.

D.  All inmates will be extended the opportunity to attend religious services, regardless of security status, the nature of his offense, or the condition of his incarceration, with the following exceptions reserved:

1.  Those inmates confined to lockdown, unless prior approval has been granted by the warden.

2.  Those inmates known to have a history of behavior problems of such nature as to make their attendance at general group religious services an undue security risk or otherwise inadvisable. It is understood, however, that any inmate so denied will have the right and the opportunity to appeal such a decision directly to the warden.

E.  Prison chaplains will be given access to the upper floor for purposes of conducting services for those inmates who are not permitted to attend general services. Such arrangements will be made in keeping with evidence of need, availability of chaplain's time, and the orderly operation of the institution.

II. PUBLIC TELEPHONE SERVICE

In order to reduce congestion, facilitate easier access, and improve administrative control over use of public telephones, the following changes will be implemented upon concurrence from appropriate officials of the South Central Bell Telephone Company:

A.  Have installed a public telephone on the upper floor and another in the annex.

B.  Sheriff Cronvich, as soon as possible, will direct a letter to the telephone company requesting the additional pay station units. A copy of said letter will be sent to the attorneys for the inmate team. It is understood that the negotiating team will be consulted in determining the precise locations for the new instruments. It is further understood that the inmates' team attorney or his designee may seek directly any explanation from the telephone company as to difficulties or reluctance in responding affirmatively to the request.

(Note: A letter from Sheriff Cronvich addressed to the telephone company, written shortly after the session at which this issue was resolved, is attached to this agreement. The new phones were, in fact, installed on May 11.)

C. Inmates will be generally allowed at least two outgoing phone calls each week. Urgent need will be given favorable consideration for additional usage.

D. If urgent calls cannot be completed by an inmate during hours at which the phone is available, arrangements will be made by prison authorities to determine when the party to be contacted can be reached within the hours the institution has made the telephones available to the inmates. Such information will be communicated promptly to the inmate.

## III. GRIEVANCE PROCEDURE

The recently established inmate council is considered a satisfactory mechanism for use in helping to resolve grievances. At the request of the inmate team, it was agreed that the warden shall attend all inmate council meetings unless otherwise specified by the council. If the warden is unavailable, the meeting is to be rescheduled at a time when he can attend.

## IV. VISITING PRIVILEGES

A. Visiting hours will henceforth be as follows:

Saturdays: 12:00 – 3:30 P.M.

Sundays: 12:00 – 2:30 P.M.

B. To the extent possible, and consistent with manpower availability, additional visiting days during the week will be arranged at the warden's discretion to meet individual special needs or circumstances.

C. Each inmate will be entitled to have not more than three visitors on any given visiting day. The number allowed in the visiting room at one time will be determined by the total number of visitors on hand.

D. A maximum of three persons who are not members of the inmate's immediate family will be authorized to be included among visitors, provided they are approved in advance by the institution authorities. A record of such authorizations will be maintained by prison officials to facilitate recognition and approval upon such visitors' arrival at the prison. Changes in the names of such pre-approved visitors may be made by the inmate after the name to be removed has been designated for a period of not less than two months.

E. Acoustical materials will be installed on the ceiling of the visiting room in order to help reduce sound problems.

F. The institution will prepare a statement of general regulations regarding matters covered by this agreement for distribution to newly arrived prisoners.

G. Parish authorities were said to be already in the process of investigating the availability of more satisfactory power phones used in the visiting room for communication through the partition. It is understood that the parish will undertake whatever measures are necessary and practical to im-

prove the communication equipment and/or to reduce present sound problems in connection with conditions in the visiting room.

For the Institutional Team:

(s) Alwynn J. Cronvich
_____
Sheriff Alwynn Cronvich, Chairman

(s) Richard Tompson
_____
Richard Tompson, Vice Chairman

Lionel R. Collins, Assistant Parish Attorney
Russell J. Schonekas, Attorney for defendants in federal court
Roland J. Vicknair, Warden, Jefferson Parish Prison
Captain John Weber, Administrative Officer, Sheriff's Department
Robert Broussard (alternate), Assistant Parish Attorney

For the Inmate Team:

(s) Erwin K. Brewer
_____
Erwin Brewer, Vice Chairman

(s) William D. Treeby
_____
William D. Treeby, Attorney for Inmate Team

(s) Michael R. Fontham
_____
Michael Fontham, Attorney for Inmate Team

* Francis Jacobs, Chairman
Frank Chicarelli, Negotiator
John Huber, Negotiator
Ulysses Bazille, Alternate Negotiator
Vernon Betsch, Alternate Negotiator
Alexander Ferguson, Alternate Negotiator

Witness:

(s) Robert F. Greenwald
_____
Robert F. Greenwald, Mediator
Community Relations Service
U.S. Department of Justice

(s) James W. Freeman
_____
James W. Freeman, Admin. Justice
Spec. Community Relations Service
U.S. Department of Justice

* Transferred to the La. State Penitentiary prior to the execution of agreement.