Joseph TAYLOR et al.,
Plaintiffs-Appellees,

v.

W. L. STERRETT et al.,
Defendants-Appellants.

No. 74–3964.

United States Court of Appeals,
Fifth Circuit.

June 1, 1976.

Earl Luna, Thomas V. Murto, III, John B. Tolle, Dallas, Tex., for defendants-appellants.

Robert L. Byrd, Tarrant County Legal Aid, Ft. Worth, Tex., John F. Jordan, Dallas, Tex., Stanley A. Bass, New York City, Sylvia M. Demarest, Dallas, Tex., for plaintiffs-appellees.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

WISDOM, Circuit Judge:

In this case we grapple with the difficult issue of prisoners' rights within the context, primarily, of censorship of inmate mail. A secondary issue relates to the prison practice of allowing "cop-out" men (investigators) access to prisoners.

This appeal is from an unreported district court order, entered November 1, 1974, placing restrictions upon the opening of inmate mail by officials at a county jail and upon visits to its inmates by the district attorney's representatives. The appellants, various officials of Dallas County, Texas, challenge the constitutional basis for these restrictions.

The prisoner-appellees initiated a class action in October 1971, contesting the constitutionality of certain conditions and practices at the Dallas County Jail, Dallas, Texas. After a trial on the merits, the district court ordered physical modifications to the jail and changes in several jail practices. See *Taylor v. Sterrett*, N.D.Tex.1972, 344 F.Supp. 411. The changes in jail practices included those directed in the following paragraphs of the district court's order:

4. The permanent injunction heretofore issued relating to censorship of mail is affirmed and carried forward in this judgment. The Sheriff is directed not to open or censor mail transmitted between inmates of the jail and the following persons: courts, prosecuting attorneys, probation and parole officers, governmental agencies, lawyers and the press.

. . . . .

8. The Sheriff is directed not to allow persons to see prisoners except with the consent or request of the inmates. This

has particular reference to 'copout' men who have had free access to the jail. *Id.* at 422–23.

On appeal, we affirmed certain portions of the order, vacated others, and remanded the case for further proceedings. See *Taylor v. Sterrett*, 5 Cir. 1974, 499 F.2d 367. Paragraph 4 of the order was vacated and remanded for further consideration in light of *Wolff v. McDonnell*, 1974, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, and *Procunier v. Martinez*,[1] 1974, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224. We also vacated paragraph 8. We suggested that on remand "an effort be made specifically to limit [the paragraph 8] requirement to the evil it is intended to extirpate, if that evil does, in fact, rise to constitutional dimensions". 499 F.2d at 369.

The district court, after consultation with the parties but without further evidentiary hearings, entered an amended order, revising paragraphs 4 and 8 of the original order to read as follows:

4. The sheriff is directed not to open mail transmitted between inmates of the jail and the following persons: courts, prosecuting attorney, probation and parole officers, governmental agencies, lawyers and the press. If, however, there is a reasonable possibility that contraband is included in the mail, it may be opened, but only in the presence of the inmates.

8. The sheriff is directed not to allow persons to see prisoners except with the consent or request of the inmate. This has particular reference to 'cop out' men who have heretofore visited inmates unrepresented by counsel for the purpose of plea bargaining. This provision is not intended to eliminate visits from official investigators engaged in the efforts to solve crime or to perform other legitimate duties, nor is it intended to eliminate, only to limit plea bargaining. The attention of the District Attorney is particularly called to this provision.

---

1. The case will be referred to as *Martinez* or *Procunier v. Martinez* to avoid confusion with *Pell v. Procunier*, 1974, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, involving the question of a prisoner's right to interviews with the press.

## I.

### MAIL RESTRICTIONS

#### A. TEACHINGS OF *PROCUNIER v. MARTINEZ* AND *WOLFF v. MCDONNELL*

The appellants contend that there is no constitutional justification for the revised paragraph 4 covering restrictions on the opening of inmate correspondence. They point out that the sole substantive change from the original paragraph 4 appears in its final sentence allowing a prisoner's mail to be opened "only" in his presence and then only if there is "a reasonable possibility that contraband is included in the mail". The appellants contend that this modification is irreconcilable with guidance provided by the Supreme Court in *Wolff* and *Martinez*. First, they argue that the condition requiring "a reasonable possibility" that contraband is included in inmate mail before it is opened runs against the declaration in *Wolff* that "a flexible test, besides being unworkable" in the context of monitoring inmate's mail by jail officials, "serves no arguable purpose in protecting any constitutional rights". 418 U.S. 577, 94 S.Ct. 2985, 41 L.Ed.2d 963. Second, the appellants assert that language in *Wolff* indicates that requiring the presence of the prisoner when his mail is opened exceeds any constitutionally compelled protection of inmate or correspondent rights. Their contention is that since the sole rationale for requiring the prisoner's presence is to prevent jail officials from reading prisoner mail, the implicit authorization to inspect mail in *Wolff* forecloses the possibility that this requirement is constitutionally mandated.

The appellants' objection to the constraints on the opening of correspondence between a prisoner and each of the enumerated classes [2] requires explication of the constitutional bases for the restrictions placed on the opening, inspecting, and reading of an inmate's correspondence with attorneys, various public officials, and the press. We begin by examining the guidance provided in *Martinez* and *Wolff*.

In *Martinez* the Supreme Court considered the constitutionality of prisoner mail censorship regulations of the California Department of Corrections. The district court had invalidated those regulations partly on the ground that they were violative of the First and Fourteenth Amendment rights of the prison inmates. *See Martinez v. Procunier*, 1973, N.D.Cal., 354 F.Supp. 1092. The Supreme Court, however, chose a different basis for invalidating them. It found that the censorship regulations necessarily impinged upon the First Amendment interests of the prisoners' correspondents. The Court, emphasizing that it was adjudicating the First Amendment rights of those who correspond with prisoners rather than of the prisoners themselves, proceeded to analyze the competing state and individual interests.

Although recognizing the traditional restraint of federal courts in dealing with problems of prison administration, the Court attempted "to formulate a standard of review for prisoner mail censorship" that responds both to the protection of First Amendment interests implicated by a censorship of prisoner correspondence and to the governmental interests of prison administration. 416 U.S. at 407, 94 S.Ct. at 1808, 40 L.Ed.2d at 237. It noted that prison security, rehabilitation, and punishment are substantial governmental interests. Mr. Justice Powell, for the Court, held that censorship of prisoner mail is justified if: (1) the regulation or practice in question furthers an important or substantial governmental interest unrelated to the suppression of expression, and (2) the limitation of First Amendment freedoms is no greater than necessary or essential to the protection of the particular governmental interest involved. Applying this standard,

---

**2.** Although the language of the revised paragraph 4 does not explicitly state that both incoming and outgoing mail is covered, a literal reading of this paragraph requires that conclu-

sion. Moreover, the prisoner-plaintiffs complained of the reading and censoring of all incoming and outgoing mail in their complaint.

the Court found that the state prison officials had failed to show that "these broad restrictions on prisoner mail are in any way necessary to the furtherance of a government interest unrelated to the suppression of expression." *Id.* Those restrictions allowed censorship of statements in prisoner mail that "unduly complain" or "magnify grievances", express "inflammatory political, racial, religious or other views", or contain "defamatory" or "otherwise inappropriate" matters.

In addition, the Court affirmed the district court's holding that the Fourteenth Amendment mandated the provision of minimum procedural safeguards whenever a decision to censor or withhold delivery of a letter is taken. It approved a procedure requiring that a prisoner receive notification of the rejection of incoming or outgoing letters, that the author of prisoner correspondence have a reasonable chance to protest this action, and that persons other than the prison official making the initial decision regarding mail hear the complaint.

It is necessary at this point to discuss the appellants' understanding of the import of *Procunier v. Martinez* for this case. They assert that the Supreme Court's analysis of the First Amendment rights of prisoners' correspondents forecloses the possibility of a constitutional justification for prohibiting the reading of inmate mail from the correspondents in question here based on the First Amendment rights of the inmates

themselves. Their reasoning is indeed partially correct. The majority opinion in *Martinez* did imply that prisoner mail might be read for the purpose of justifiable censorship. But that authorization was given in circumstances sharply different from those in this case. We are adjudicating the constitutional justification for prison mail procedures involving correspondence with a small number of special, largely governmental parties, rather than those related to correspondence with the general public.[3] The nature of the former correspondents brings into play prisoner interests in access to the courts and effective assistance of counsel. When First Amendment interests are intermeshed with other fundamental prisoner interests, courts are aware that special protections may be necessary. *See* Comment, *Prisoners' First Amendment Rights*, 70 Nw.U.L.Rev. 352, 353–354 (1975). In view of this distinction, *Martinez* did not settle the issues we confront here.

In *Wolff* the Supreme Court considered the constitutionality of state prison disciplinary hearings, prisoner legal assistance programs, and regulations governing the inspection of prisoner correspondence with attorneys. The contested mail regulation provided for the reading and inspection of all incoming and outgoing mail. The district court sharply restricted this practice in regard to incoming mail from attorneys.[4] It allowed this mail to be opened only if there was a reasonable possibility that con-

---

**3.** The district court in *Martinez* did not reach the issue of restrictions on prisoner-attorney mail. *See Martinez v. Procunier*, 354 F.Supp. at 1095. The inmate-plaintiffs had alleged constitutional violations in this respect in their complaint, but the issue was rendered moot by *In re Jordan*, 1972, 7 Cal.3d 930, 103 Cal.Rptr. 849, 500 P.2d 873. There, the California Supreme Court held that censorship of prisoner-attorney correspondence was precluded by Cal. Penal Code § 2600(5) (West 1970). That state statute provided that prisoners may correspond confidentially with any member of the State Bar or public office holder subject only to inspection for contraband.

**4.** The district court's ruling on restrictions on outgoing mail to attorneys was not before the Supreme Court or the Court of Appeals. 418 U.S. at 544 n. 3, 94 S.Ct. at 2969, 41 L.Ed.2d at

944; *see McDonnell v. Wolff*, 8 Cir. 1973, 483 F.2d 1059. That court required the Nebraska Penal and Correctional Complex to modify the regulation regarding censorship of inmate mail to and from attorneys and courts in accordance with its interpretation of *Moore v. Ciccone*, 8 Cir. 1972, 459 F.2d 574. *See McDonnell v. Wolff*, D.Neb.1972, 342 F.Supp. 616, 625. The plaintiffs attacked only restrictions on correspondence between inmates and attorneys, but the district court considered constraints on inmate mail to and from courts implicitly reached by their allegations. *See id.* In line with the *Ciccone* decision, therefore, the district court's ruling on outgoing mail to attorneys and courts was that it may not be opened or inspected to avoid infringement of an inmate's right of access to the courts.

traband was included in it. Furthermore, a letter from an attorney marked "privileged" could be opened only in the presence of the prisoner. The Court of Appeals added the specific condition that before an attorney's letter to a prisoner is opened, prison officials should make an attempt to ascertain the authenticity of the source. A letter questionably sent by an attorney was to be opened only in "appropriate circumstances" in the presence of the prisoner. 483 F.2d at 1067.

Before the Supreme Court, the state prison officials retreated from the assertion of a right to open and read mail from attorneys to prisoners. Instead they contended: "that they may open all letters from attorneys as long as it is done in the presence of the prisoners. The narrow issue thus presented [wa]s whether letters determined or found to be from attorneys may be opened by prison authorities in the presence of the inmate or whether such mail must be delivered unopened if normal detection techniques fail to indicate contraband". 418 U.S. at 575, 94 S.Ct. at 2984, 41 L.Ed.2d at 962.

The procedure allowing the opening of mail from attorneys in the presence of prisoner recipients was challenged by the prisoners on First, Sixth, and Fourteenth Amendment grounds. The Court did not, however, elaborate the precise perimeters of any of the asserted rights. It held instead that the opening of mail from attorneys in the presence of prisoners did not infringe those rights. The Court also disapproved of any "flexible" test permitting opening of this correspondence only "in appropriate circumstances" or if there is a reasonable possibility that contraband is included in it. *Id.* at 576–577, 94 S.Ct. at 2985, 41 L.Ed.2d at 962–963.

This disposition of *Wolff* left open significant questions concerning the constitutional underpinning of constraints on the opening and reading of inmate mail by prison officials. We recognized the vitality of those issues in *Gates v. Collier*, 5 Cir. 1974, 501 F.2d 1291, *modified en banc as to attorneys' fees*, 1975, 522 F.2d 81, but did not decide them. In *Gates*, inmates at the Mississippi State Penitentiary at Parchman, Mississippi, alleged abridgement of constitutional and statutory rights by the existence of certain conditions and practices at the prison. One of the contested practices was the censoring of all incoming and outgoing mail of prisoners. Prior to trial, however, censorship was voluntarily eliminated and the opening of prisoner mail was limited to inspection of all incoming mail for money in the presence of the prisoner. The district court, nonetheless, entered its judgment in October 1972, substantially limiting the ability of prison officials to open, inspect, or read prisoner correspondence.[5] N.D.Miss. 1972, 349 F.Supp. 881.

---

**5.** (1) Said defendants, and all persons in privity with them, shall not open or otherwise interfere with any outgoing mail of inmates addressed to:

(a) Officials of the federal, state and local courts;

(b) All federal officials including the President of the United States, any senator or congressman, and officials of any United States agency or department; all state officials including the Governor, members of the state Senate and House of Representatives and officials of any state agency or department;

(c) All members and employees of the State Probation and Parole Board;

(d) The attorney of record of an inmate in any pending action, civil or criminal, in any duly constituted local, state or federal court.

(2) Said defendants, and all persons in privity with them, are prohibited from interfering with outgoing mail of inmates to any other addressee except to open and inspect, in the presence of the inmate, any letter where prison officials have reasonable grounds to suspect such communication is an attempt to formulate, devise or otherwise effectuate a plan to escape from the penitentiary, or to violate the laws of the State of Mississippi or of the United States.

(3) The defendants, and all persons in privity with them, are prohibited from interfering with incoming mail from any source except to open and inspect such mail, in the presence of the inmate addressee, whenever the prison officials have reasonable grounds to suspect escape attempts or to discover drugs, weapons or other material expressly prohibited by state or federal laws or by prison rules.

*Gates v. Collier*, 349 F.Supp. at 898–899.

The district court's order resulted in the promulgation of new state penitentiary regulations regarding prisoner correspondence.[6] *See Gates v. Collier,* 501 F.2d at 1310–1311 and n. 8. This circumstance as well as the parties' failure to challenge specifically the district court's order regarding prisoner correspondence made it: "inappropriate in . . [*Gates*] to delimit the boundaries of the First Amendment mail protection of the inmates' *correspondents* and to define to what extent an *inmate's* First Amendment rights survive incarceration". *Id.* at 1314. We concluded that: "[t]herefore, we do not adjudicate whether the requirements that the inspection be in the presence of the inmates, as well as the other components of the district court's order are constitutionally compelled . . . ." *Id.*

### B. APPLICABLE PRISONERS' RIGHTS

The appellants' contention that they may open, inspect, and read[7] all prisoner correspondence with the persons listed in the revised paragraph 4 brings before us not only the First Amendment issues left undecided in *Gates,* but also questions involving the alleged abridgement of prisoner rights to access to the courts and to effective representation of counsel. Since the district court's initial and revised orders were made in the context of a constitutional challenge to jail practices affecting prisoner mail,[8] our examination of the possible constitutional underpinnings of paragraph 4 must refer to the prisoners' allegations.

In their original complaint the plaintiffs launched a broad attack upon constraints on prisoner communication and facilities for communication with persons outside the jail. Those constraints, including restrictions on prisoner mail, allegedly abridged prisoner rights to due process and equal protection of the law, "access to the courts, adequate preparation for trial, adequate representation by counsel, a fair trial, the right to petition for redress of grievances, and the freedom of association and political thought." On appeal the prisoners narrowed this variety of constitutional grievances to three basic constitutional contentions. The appellees assert that the revised paragraph 4 protects their First Amendment rights, their Sixth Amendment right to effective representation by counsel, and their Fourteenth Amendment right of access to the courts. They contend that the practice of opening and reading mail between prisoners and the persons listed in the revised paragraph 4 would at least chill those communications resulting in the diminution of these rights.

An assessment of the interests at stake here rests on a balancing process. The

---

6. The district court later had occasion to consider the constitutional justification for one aspect of the revised prison mail regulations. It received evidence "on the limited issue of the prison officials' authority to open and inspect, but not read, in-coming inmate mail of a non-privileged character, in the absence of the inmate". *Gates v. Collier,* N.D.Miss.1975, 390 F.Supp. 482, 484–485, *aff'd per curiam,* 5 Cir. 1976, 525 F.2d 965. Privileged mail was defined as that addressed to or received from courts, public officials or agencies, and inmates' attorneys. *Id.* at 492–93. Practical difficulties in following the procedure of opening incoming inmate mail of a non-privileged nature only in the presence of the inmate at the 20 widely scattered residential units at Parchman resulted in an "uninterrupted" flow of contraband materials, such as merchandise fraudulently ordered on credit by inmates, cash, and drugs. In this factual context the court held that the state's substantial interests of security, discipline, and good order justified the inspection only of incoming mail from the general public at a central location in the absence of the inmate-addressee. 390 F.Supp. at 484 & n. 2. It also held that this procedure was not violative of any First Amendment rights and conformed with the instruction of *Procunier v. Martinez.* On appeal, we held that the trial court did not abuse its broad discretion by this revision of an ongoing injunctive decree. 525 F.2d at 966.

7. During oral argument counsel for the appellants clarified the reading aspect of this activity by stating that mail would be read only for information affecting jail security. Their counsel also indicated that attorney-client messages intercepted in the course of reading inmate mail would be considered confidential.

8. The district court, however, did not specifically elaborate the constitutional justification for either its original or revised paragraph 4. *See* 344 F.Supp. 414, 422.

"[t]raditionally . . . broad hands-off attitude [of federal courts] toward problems of prison administration" explained by Mr. Justice Powell in *Martinez*, 416 U.S. at 404–406, 94 S.Ct. at 1807, 40 L.Ed.2d at 235, has an equally vigorous companion principle. We are instructed that when a "prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights". *Id.*, citing *Johnson v. Avery*, 1969, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718, 721. Unquestionably, the gate is not now open for federal courts to inject themselves as "the front line agenc[y] for the consideration and resolution of the infinite variety of prisoner complaints". 416 U.S. at 404 n. 9, 94 S.Ct. at 1807, 40 L.Ed.2d at 235. We are, nonetheless, burdened today with a variety of actions contesting the constitutionality of prison and jail conditions, and more specifically, restrictions on prisoner correspondence.[9]

▪ After *Martinez*, censorship of general inmate mail must pursue a substantial government interest to conform to constitutional standards. "Censorship" in that case referred in part to the practice of refusing to mail inmate letters to outside correspondents or to deliver letters from outside correspondents to prisoners. *See* 416 U.S. at 400, 94 S.Ct. at 1805, 40 L.Ed.2d at 233.

The phenomenon of censorship, of course, appears in a multitude of forms. Its essence is "interference with . . . intended communication". *See Procunier v. Martinez*, 416 U.S. at 408–409, 94 S.Ct. at 1809, 40 L.Ed.2d at 237. The practice of censorship may equally involve direct or indirect interference. For example, in *Martinez* aside from refusing to mail or to deliver prisoner correspondence, prison employees could deal with objectionable letters by submitting "a disciplinary report, which could lead to suspension of mail privileges or other sanctions . . . [or by placing] . . . a copy of the letter or a summary of its contents in the prisoner's file, where it might be a factor in determining the inmate's work and housing assignments and in setting a date for parole eligibility". *Id.* at 400, 94 S.Ct. at 1805, 40 L.Ed.2d at 233. Thus, a prisoner's correspondents were denied effective communication by direct confiscation of their letters, and also by an indirect chilling of the content of that correspondence.

Although we confront more in this case than alleged abridgements of First Amendment rights, freedom from an indirect form of censorship is the essential relief that the prisoner-plaintiffs are seeking. They contend that the opening of their mail outside of their presence or the reading of that mail by prison officials interferes unnecessarily with communications between themselves and the correspondents referred to by categories in the revised paragraph 4. A concomitant result of this interference, they argue, is the abridgement of their Sixth Amendment right to effective counsel and their Fourteenth Amendment right of access to the courts. Our consideration of the constitutional support for the revised paragraph 4 encompasses an analysis of each of the asserted rights.

We hold that the restrictions set forth in the revised paragraph 4 on the handling of prisoner mail are, with one important exception, compelled by the constitutional rights of the prisoners. The single exception is the qualification that there be a "reasonable possibility" of the inclusion of contraband insofar as it affects incoming mail. No persuasive constitutional justifi-

---

9. *See, e. g., Martin v. Wainwright,* 5 Cir. 1976, 526 F.2d 938 (prisoner's pleadings stated a cause of action for interference with outgoing legal mail and access to the courts); *Hardwick v. Brinson,* 5 Cir. 1975, 523 F.2d 798 (§ 1983 action alleging illegal censorship of inmate mail by Georgia prison officials was to be considered on merits in light of *Procunier* and its progeny); *McCray v. Sullivan,* 5 Cir. 1975, 509 F.2d 1332 (denial of injunctive relief regarding prison officials' handling of prisoner mail vacated); *Mills v. Sullivan,* 5 Cir. 1974, 501 F.2d 939 (dismissal of § 1983 action alleging denial of access to the courts by prison officials' interference with an inmate's mail from an attorney was vacated); *Barlow v. Amiss,* 5 Cir. 1973, 477 F.2d 896, 898 ("the denial of free and unfettered communication between inmates and courts and attorneys may constitute a denial of federal constitutional rights").

cation has been offered for imposing this additional burden on prison officials.

## (1) ACCESS TO THE COURTS

■ To distill the dominant feature of this case it is important to characterize the interests corresponding to the categories of prisoner correspondents as identified in the revised paragraph 4. Those correspondents are, with the exception of governmental agencies [10] generally and the press, essentially individuals or agencies closely connected to the judicial process. The primary interests of convicted prisoners, as well as of pretrial detainees,[11] in corresponding with courts, prosecuting attorneys, probation or parole officers, and lawyers are obvious. They may wish to challenge their convictions, advance the timing and terms of their release from confinement, reform prison conditions, or conduct or assist in the preparation of their defense. Although not in as direct a fashion as these "legal" agencies, government agencies may also bear a relationship to legal proceedings affecting prisoners. They are, for instance, often sources of important information, financial support for families during incarceration, or post-release assistance. And finally, in certain instances the press also finds itself actively participating in the external circumstances of judicial proceedings. It may, for example, create publicity either assisting or hindering a prisoner's cause.

The nature of these interests clearly reveals that the district court's primary concern was to safeguard a prisoner's access to the courts. This emphasis perhaps reflects the recurrent judicial attitude that the right of access to the courts is afforded special protection. *See McCray v. Sullivan,* 5 Cir. 1975, 509 F.2d 1332; *Eisenhardt v. Britton,* 5 Cir. 1973, 478 F.2d 855; *Barlow v. Amiss,* 5 Cir. 1973, 477 F.2d 896; *Frye v. Henderson,* 5 Cir. 1973, 474 F.2d 1263; *Schack v. Wainwright,* 5 Cir., 391 F.2d 608, *cert. denied,* 1968, 392 U.S. 915, 88 S.Ct. 2078, 20 L.Ed.2d 1375. We recognized in *McCray* that " '[a]n inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold. . . . All other rights of an inmate are illusory without it . . . .' " 509 F.2d at 1337, citing *Adams v. Carlson,* 7 Cir. 1973, 488 F.2d 619, 630.

Judicial perception of the interaction between the right of access to the courts and prison restrictions on a prisoner's communications with "legal" entities or persons probably began with the landmark case of

---

**10.** The district court did not define the term "government agencies" as used in its original and revised paragraph 4. Since courts, prosecuting attorneys, and probation or parole officers are also mentioned in paragraph 4, we infer that "government agencies" refers to public entities that are not directly related to the criminal law system.

**11.** The majority of persons confined in the Dallas County Jail are pre-trial detainees. The presumptively innocent status of these individuals requires even closer scrutiny of limitations on their fundamental rights and liberties than is warranted when the same restrictions are placed on convicted inmates. *See Anderson v. Nosser,* 5 Cir. 1971, 438 F.2d 183, 190, *aff'd in pert. part,* 456 F.2d 835 (en banc), *cert. denied,* 1972, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89. Pre-trial detainees must be held under the least restrictive means necessary to assure their presence at trial. *See Rhem v. Malcolm,* 2 Cir. 1974, 507 F.2d 333, 336; *Hamilton v. Love,* E.D.Ark.1971, 328 F.Supp. 1182, 1292 (interim order), *final order entered,* 358 F.Supp. 338, *motion order entered,* 1973, 361 F.Supp. 1235; Comment, *Pre-Trial Detention: Constitutional Standards,* 28 Ark.L.Rev. 129, 134 (1974); 3 Ford L.J. 685, 692 (1975). *See also Anderson v. Nosser,* 438 F.2d at 190; Note, *Discipline In Jails: The Due Process Rights of Pre-Trial Detainees,* 54 B.U.L.Rev. 796, 797 (1974). Although it is correct to assume that there may be differences in the rights to which pre-trial detainees and convicted prisoners are entitled, *see Main Road v. Aytch,* 3 Cir. 1975, 522 F.2d 1080, 1086, the reasons for such differences are not present in this case. Punishment and rehabilitation, legitimate governmental interests applicable to the latter but not the former group, are not asserted by the appellants as justifications for opening and reading inmate correspondence with the enumerated correspondents. Jail security is the sole interest at stake. Since the appellants have not argued that this kind of correspondence of convicted inmates poses a greater security threat than that of pre-trial detainees, we consider the alleged threat equally applicable to these two categories of inmates. Thus, our analysis and holding reach jail procedures affecting the correspondence of both categories of inmates.

*Ex parte Hull,* 1941, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034. In *Hull* prison officials refused to mail a prisoner's habeas corpus petition because he had not complied with a prison regulation requiring approval of the petition by a state official. The purpose of the regulation was to insure that legal documents were "properly drawn". 312 U.S. 548–549, 61 S.Ct. 641–642, 85 L.Ed. 1035–1036. The Court invalidated the regulation, holding that prison officials may not impair or abridge a prisoner's right of access to the courts in seeking a writ of habeas corpus.

Along with judicial recognition that courts must abandon their traditional deference to prison authorities when constitutional violations are involved, there is an increasing acknowledgement that interference with mail between prisoners and legal correspondents may abridge the right of access to the courts. In *McCray,* we stated that a prison policy preventing prisoners in punitive isolation from receiving mail or writing writs may unconstitutionally infringe the right of access to the courts. The case was remanded in part for consideration of that issue. Significantly, we noted that restrictions on the manner in which prisoners in punitive isolation communicate with their attorneys and courts "must be based on compelling needs of prison administration and discipline". 509 F.2d at 1337.

Sensitivity to the role of legal correspondence in the efforts of prisoners to utilize the judicial process appears in many recent cases. In *Sostre v. McGinnis,* 2 Cir. 1971, 442 F.2d 178, 200 (en banc), *cert. denied,* 1972, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254, the Court stated that "letters addressed to courts, public officials, or an attorney when a prisoner challenges the legality of either his criminal conviction or the conditions of his incarceration" are "*[s]ui generis* in both logic and the case

law". Although refusing to rule out censorship of this mail when it is demonstrated that a prisoner has clearly abused his right of access to the courts, e. g. by using this correspondence to communicate with third parties about unlawful activities, the Court otherwise forbade prison officials to delete material from, withhold, or refuse to mail correspondence between an inmate and these parties. "[T]he importance of permitting free and uninhibited access by prisoners to both administrative and judicial forums for the purpose of seeking redress of grievances" warrants "protection against the reality or the chilling threat of administrative infringement". 442 F.2d at 200.

Other courts have consistently afforded extensive protections to inmate communications with courts, public officials, or attorneys on the basis of a right of access to the courts.[12] For example, in *Adams v. Carlson,* 488 F.2d at 632, the Seventh Circuit upheld a challenge to a requirement that in a prison visiting room lawyers meeting with prisoner-clients transmit documents and other written material to prisoners positioned on the other side of a glass partition only through prison guards who had temporary but unobserved possession of these materials. This arrangement placed an impermissible burden on the process of consultation between attorneys and their clients. In a later case, *Bach v. Illinois,* 7 Cir. 1974, 504 F.2d 1100, 1102, the Court held that an inmate is entitled to be present during the opening of his legal mail. The inspection of this mail outside of the prisoner's presence would dilute private attorney-client communications vital to the effective assistance of counsel and access to the courts. *See Smith v. Robbins,* S.D.Me.1971, 328 F.Supp. 162, 164–165, *aff'd in pert. part,* 1 Cir. 1972, 454 F.2d 696.

A pertinent example of the potency of the right of access to the courts is found in

---

12. *See, e. g., Moore v. Ciccone,* 8 Cir. 1972, 459 F.2d 574, 578 (en banc) (Lay, Heaney, Bright and Ross, JJ., concurring); *Coleman v. Peyton,* 4 Cir. 1966, 362 F.2d 905, 907; *Frazier v. Donelon,* 1974, E.D.La., 381 F.Supp. 911, 918–919, *aff'd per curiam,* 5 Cir. 1975, 520 F.2d 941 (unpublished), *cert. denied,* —— U.S. ——, 96

S.Ct. 1134, 47 L.Ed.2d 332 [No. 75–5905, 1976]; *Conklin v. Hancock,* D.N.H.1971, 334 F.Supp. 1119, 1122–23; *Marsh v. Moore,* D.Mass.1971, 325 F.Supp. 392, 394–395; *Palmigiano v. Travisono,* D.R.I.1970, 317 F.Supp. 776, 789. *See also Carothers v. Follette,* S.D.N.Y.1970, 314 F.Supp. 1014.

the Supreme Court's treatment of prison regulations proscribing prisoner access to attorneys' legal assistants in *Martinez*. The Court first explained the status of the right of access to courts as a corollary of the constitutional guarantee of due process of law.[13] 416 U.S. at 419, 94 S.Ct. at 1814, 40 L.Ed.2d at 243; *see Johnson v. Avery,* 1969, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718; *Ex parte Hull,* 1941, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034. It then weighed the burden on prisoner access to the courts caused by this regulation against the legitimate interests of prison administration and the deference judges should give to the expertise and discretionary authority of prison officials.

The Court noted particularly the district court's finding that the ban on "the use of law students or other para-professionals for attorney-client interviews would deter some lawyers from representing prisoners who could not afford to pay for their travelling time or that of licensed private investigators". 416 U.S. at 420, 94 S.Ct. at 1814, 40 L.Ed.2d at 244. Against this background it accepted the district court's view that the right of access to the courts was substantially burdened by the regulation. After analyzing the countervailing state interest in the operation of this ban, the Court rejected it as unpersuasive. The Court noted that the absolute ban was not limited to prospective interviewers or inmates posing a possible security threat. The prison officials had not established that any undue burden on prison administration would result from a ban tailored to specific security risks. And finally, the Court felt that no justification for the absolute ban could be successfully given where an arbitrary distinction was made allowing law students participating in law school clinical programs to interview prisoners, while excluding law students employed by practicing attorneys.

■ Our view of alleged infringements of the right of access to the courts in this case similarly rests on weighing the burden on the prisoner's access to the courts against the legitimate governmental interest of prison security. Before procedures that impede a prisoner's access to the courts may be constitutionally validated, it must be clear that the state's substantial interests cannot be protected by less restrictive means.[14] *See Marsh v. Moore,* D.Mass.1971, 325 F.Supp. 392, 394.

■ First, we observe that it is unnecessary to consider separately the Sixth Amendment rights of the prisoner-plaintiffs. Any infringement of the right to effective counsel by the reading of an inmate's correspondence with an attorney is included within a concurrent abridgement of the right of access to the courts. Pre-trial detainees are ordinarily most interested in communication with attorneys as a vital component of their right to counsel in pending criminal prosecutions. Since the right to effective counsel under the Sixth Amendment extends only to criminal matters, *see Wolff v. McDonnell,* 418 U.S. at 576, 94 S.Ct. at 2984, 41 L.Ed.2d at 962, it is applicable solely to pre-trial detainees or to a convicted prisoner being tried on additional charges or contesting the legality of a previous conviction.

■ The right of access to the courts, on the other hand, is available to both categories of prisoners to contest the legality of

---

13. The Supreme Court has also viewed the right of access to the courts as one aspect of the First Amendment right to petition. See *California Motor Transport Co. v. Trucking, Unlimited,* 1972, 404 U.S. 508, 510, 92 S.Ct. 609, 612, 30 L.Ed.2d 642, 646.

14. The use of this relatively high standard of justification for restrictions on inmate access to the courts does not portend grave security risks in the prison environment. Jail security alone is unquestionably a substantial or compelling governmental interest. Whenever a jail practice or procedure furthers the interest of jail security in a manner that is necessary or essential to that interest, there is no constitutional violation. *Cf. Procunier v. Martinez,* 416 U.S. 424 n. 4, 94 S.Ct. 1816, 40 L.Ed.2d 246 (Marshall, J., concurring). But we take the terms "necessary" or "essential" to mean that there is no alternative means of protecting jail security that is reasonably available to prison officials. This is the least that should be required when a fundamental interest such as access to the courts is at stake.

any conviction or the constitutionality of prison conditions.[15] *Procunier v. Martinez,* 416 U.S. at 419, 94 S.Ct. at 1814, 40 L.Ed.2d at 243. It seems correct, however, both in logic and precedent to extend explicitly any protections available to prisoners under the right of access to the courts to all criminal matters involving them. If prisoners have a right to effective assistance of counsel, as a corollary of their right of access to the courts in contesting their convictions or prison conditions, then pre-trial detainees or convicted prisoners facing further criminal prosecutions should have the same right in relation to their initial defense efforts. The principles of basic fairness which support a right to effective assistance of counsel in contesting criminal convictions apply even more forcefully to the underlying criminal adjudication that results in incarceration or an additional prison term.

▇▇▇ A convicted prisoner's entitlement to effective assistance of counsel as part of the right of access to the courts has been recognized in numerous cases presenting issues similar to those before us. *See Bach v. Illinois,* 7 Cir. 1974, 504 F.2d 1100, 1102; *Adams v. Carlson,* 7 Cir. 1973, 488 F.2d 619, 630–31; *Goodwin v. Oswald,* 2 Cir. 1972, 462 F.2d 1237, 1241; *Guajardo v. McAdams,* S.D.Tex.1972, 349 F.Supp. 211, 215–217, *vacated on other grounds,* 5 Cir. 1973, 491 F.2d 417 (en banc), *cert. denied,* 1974, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771; *Morales v. Turman,* E.D.Tex.1971, 326 F.Supp. 677, 679. *See also* 23 Kan.L.Rev.

544, 553 (1975). Restrictions may not be placed upon the attorney-client relationship which effectively diminish a prisoner's access to the courts. *See Souza v. Travisono,* D.R.I.1973, 368 F.Supp. 959, 967, *aff'd in pert. part,* 1 Cir. 1974, 498 F.2d 1120. In the instant case the appellees argue that the reading of their correspondence with attorneys impinges on their right to effective assistance of counsel. This practice has that effect if the inmates' opportunities for uninhibited, confidential communications are significantly decreased. We conclude that any protections for attorney-prisoner mail grounded on the right of access to the courts are available equally to prisoner efforts to prepare a defense, contest the legality of a conviction, or challenge the constitutionality of prison conditions.

We attempt now to weigh the interests at stake. The appellants assert a legitimate need to open and read prisoner mail outside the presence of the prisoner. The interest they identify is jail security as affected by the introduction of contraband into the jail and by the communication of escape plans or other information about criminal activities.[16] This governmental interest requires the elimination of the qualification in the revised paragraph 4 that there be "a reasonable possibility" of the inclusion of contraband in prisoner mail before it is opened. It does not, however, justify all that the appellants demand.

In the first instance, we see no justification whatsoever for opening or reading cor-

---

**15.** Some courts have extended more broadly the protections afforded to inmates by the right of access to the courts. See *Goodwin v. Oswald,* 2 Cir. 1972, 462 F.2d 1237, 1243, n. 6 ("communication on any legal questions and issues intended to obtain redress for alleged unconstitutional rules or actions"); *Gomes v. Travisono,* D.R.I., 353 F.Supp. 457, 469 (any legal proceedings), *rev'd in part on other grounds,* 1 Cir. 1973, 490 F.2d 1209, *cert. denied,* 1974, 418 U.S. 910, 94 S.Ct. 3202, 41 L.Ed.2d 1156. *See also Cross v. Powers,* D.Wis.1971, 328 F.Supp. 899, 902; 23 Kan.L. Rev. 544, 548 (1975). The First Circuit, however, considers the extension of the protections related to the right of access to the more "mundane" legal problems of inmates, such as divorce, bankruptcy, and probate, to be an open

question. See *Souza v. Travisono,* 1 Cir. 1974, 498 F.2d 1120, 1123–24.

**16.** The appellants' suggestion during oral argument that opening correspondence in an inmate's presence creates an onerous administrative burden is not persuasive. There is no showing in the record of the administrative cost of the present jail mail system as opposed to the cost of the system existing before this suit was filed. It is doubtful, in any event, that a justification grounded in the public cost of remedial practices should carry substantial weight when a burden on the fundamental right of access to the courts is involved. *Cf.* Note, *Specifying the Procedures Required by Due Process: Toward Limits on the Use of Interest Balancing,* 88 Harv.L.Rev. 1510, 1527 (1975).

respondence addressed to the courts, prosecuting attorneys, parole or probation officers, and identifiable attorneys. The content of this outgoing mail cannot, except on the most speculative theory, damage the security interests of jail administration. *See Preston v. Cowan,* W.D.Ky.1973, 369 F.Supp. 14, 23; *Palmigiano v. Travisono,* 317 F.Supp. at 789. As a general proposition, it must be assumed that mail addressed to government offices or licensed attorneys containing contraband or information about illegal activities will be treated by the recipients in a manner that cannot cause harm.[17]

■ It is evident that mail addressed to supposed attorneys would pose a higher risk. Prison officials cannot assume that all *outgoing* correspondence designated by an inmate as addressed to an attorney is in fact directed to an individual admitted to the practice of law. They must, therefore, have the benefit of some uncomplicated technique for ascertaining the status of supposed attorneys. Requiring that prisoners wishing to correspond with an "identifiable attorney"[18] present the name and business address of the attorney, perhaps by way of the sealed letter itself, to prison officials 48 hours before that correspondence is to be placed in the mails is a procedure that obtains this result. Lists of licensed attorneys in the state and reference books containing attorneys admitted to

practice in other states are readily available to ensure that only actual attorneys will receive this special correspondence. *See Guajardo v. McAdams,* 349 F.Supp. at 218. The threat to prison security arising from the mailing of unopened letters to identifiable attorneys is much more remote than if this category were any attorney-addressee.

At the same time, the use of this procedure and our suggested definition of identifiable attorney safeguard a prisoner's access to the courts. We have extended the protection of unopened, outgoing mail to any identifiable attorney either representing or being asked to represent a prisoner in relation to any criminal or civil problem. Although the prisoner's right of access to the court is most clearly connected to criminal matters and civil rights actions, the inherent likelihood that most prisoners will look, at least initially, to the same attorney for advice on all legal problems supports the inclusion of all civil matters.

Before continuing, we observe that official interference with outgoing or incoming mail between inmates and government agencies generally or the press is not reached in this case by the protection derived from an inmate's right of access to the courts. We postpone for the moment consideration of jail practices concerning this correspondence.

17. The district court in *Frazier v. Donelon,* 381 F.Supp. at 919 n. 12, endorsed the Federal Bureau of Prisons policy of stamping the following on outgoing inmate mail:

Federal Correctional Institution
(Location of Institution)
Date _ _ _
The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has neither been opened nor inspected. . . . If the writer encloses correspondence for forwarding to another addressee, please return the enclosure to the above address.

This or a similar approach would call to the attention of government offices or agencies, as well as attorneys and press representatives, the source of inmate correspondence and the procedure to be used in the event an inmate tries to abuse mail rights.

18. By "identifiable attorney" we mean any licensed attorney who is representing, is being

contacted to represent, or is contemplating representing an inmate in any criminal or civil matter. *See generally* Wedlock, *The Emerging Rights of the Confined: Access to the Courts and Counsel,* 25 So.Car.L.Rev. 605, 654 (1973). The definition given by the district court in *Gates v. Collier,* 390 F.Supp. at 493, is adopted for purposes of this opinion:

The inmate's attorney(s). For the purpose of these regulations, this includes any attorney representing the inmate in any pending or contemplated action—civil or criminal—in any duly constituted local, state or federal court, or any attorney that the inmate is attempting to retain for such purpose. It also includes any attorney whom the inmate has retained or contacted, or is attempting to retain or contact, for legal advice concerning any other civil or criminal matter. The term attorney also includes any legal services organization providing legal assistance through employee-attorneys.

Incoming mail from the other listed categories of prisoner correspondents warrants different treatment.[19] The prisoner's interest in unimpaired communication with individuals or agencies related to the judicial process is, of course, the same with respect to outgoing and incoming mail. But the governmental interest in monitoring incoming mail is more substantial than its interest regarding outgoing mail. As the Supreme Court recognized in *Wolff,* there is a realistic possibility of contraband, such as narcotics or weapons, being enclosed in mail from any ostensible source. *See* 418 U.S. at 577, 94 S.Ct. at 2985, 41 L.Ed.2d at 963. The appellants urge persuasively that the *Wolff* Court discouraged the use of flexible tests such as the "reasonable possibility" of the presence of contraband condition for opening inmate mail ordered by the district court in this case. We therefore reject the "reasonable possibility" requirement of the revised paragraph 4.

The decision in *Wolff,* however, does not support the appellants' insistence that jail officials may properly read any prisoner correspondence. The Court's rationale for downplaying the *Wolff* plaintiffs' allegations about censorship and chilling of prisoner-attorney communications is applicable here. The Court remarked that opening the mail in the presence of inmates did not constitute censorship "since the mail would not be read. Neither could it chill such communications, since the inmate's presence insures that prison officials will not read the mail". 418 U.S. at 577, 94 S.Ct. at 2985, 41 L.Ed.2d at 963.

 In this perspective, we hold that the inmate's right of access to the courts supports that portion of the district court's order requiring that incoming prisoner mail from courts, attorneys,[20] prosecuting attorneys, and probation or parole officers be opened only in the presence of the inmate. This inspection is limited to locating contraband. It does not entail reading an enclosed letter. It should be emphasized that this requirement does not preclude a "probable cause" search or seizure of the envelope and its contents in the appropriate circumstances.

Our analysis of the competing interests underlying this resolution of restrictions on the opening and reading of these categories of incoming prisoner mail is not complex. The basic prisoner interest is in uninhibited communication with attorneys, courts, prosecuting attorneys, and probation or parole officers. Both pre-trial detainees and convicted prisoners have a vital need to communicate effectively with these correspondents. This is to insure ultimately that the judicial proceedings brought against or initiated by prisoners are conducted fairly. Since the prisoner's means of communicating with these parties are restricted sharply by the fact of incarceration, the essential role of postal communications cannot be ignored.

The potential inhibiting factor present here is the appellant's assertion of a right to read all incoming prisoner mail. The appellees have not specifically objected in their brief or oral argument to the practice of merely opening incoming inmate mail in the presence of the inmate.

The appellants' statement that they intend to read inmate mail only for information affecting jail security is accepted as made in good faith. This guarantee, however, does not dissolve the damaging aspect

19. See Comment, *Prisoners' First Amendment Rights,* 70 Nw.U.L.Rev. 352, 369 (1975). *See also Gates v. Collier,* 390 F.Supp. at 492–95; *Frazier v. Donelon,* 381 F.Supp. at 918–19; *Preston v. Cowan,* 369 F.Supp. at 23–24.

20. Consistent with the Supreme Court's discussion in *Wolff v. McDonnell,* 418 U.S. at 596–599, 94 S.Ct. at 2985, 41 L.Ed.2d at 963, we think it permissible that prison officials require attorneys wishing to correspond confidentially with prisoners first to identify themselves by means of a signed letter. The procedure ordered by the Court in *Marsh v. Moore,* 325 F.Supp. at 395, is one approach to this problem. There, any attorney wishing to correspond with an inmate was required to enclose confidential writings in a sealed envelope to be mailed to the prison inside a larger envelope containing a signed cover letter.

of the mail practices the jail officials wish to use. The inhibitory effect remains because the medium through which sensitive legal communications are to be transmitted is unshielded. As the First Circuit Court of Appeals suggested in *Smith v. Robbins,* 454 F.2d at 697, the fact that prison officials are entirely trustworthy is irrelevant. The controlling factor is that attorneys or prisoners may fear that prison employees who read inmate correspondence will abuse the sensitive information to which they have access. This concern would not be unreasonable with respect to any other attorney-client relationship if confidential information were exposed to third party interception. It is equally operative here.

Other inhibiting factors affect mail to and from correspondents who are not attorneys. Inmates may fear, for example, that jail officials will respond adversely to attempts to bring jail conditions to the attention of those persons. They may also hesitate to pursue certain defenses or remedies, such as those adversely implicating police officials, out of concern that incoming correspondence will reveal that activity to possibly resentful jail officials.[21] Although these concerns are unfounded in most circumstances, the inhibitory effect of a jail official's access to information contained in this correspondence may diminish an inmate's lawful access to the courts. We find, accordingly, that the inmate's interest in unread communications from non-lawyer correspondents is substantial.

The government interest assertedly requiring the reading of all incoming mail is jail security. The appellants contend that they must not only be able to search envelopes for physical contraband, but that escape plans or information about other criminal activity can be ferreted out only by reading enclosed written material. Their

basic argument is that the official appearance of an envelope does not guarantee the authenticity of the source. Although there is no evidence in the record to this effect, they cite instances where official envelopes mailed to jail inmates were found to contain contraband.

The security implications of concealment of contraband and information about criminal activities in incoming mail from the specified sources are unquestionably greater than with respect to outgoing mail to official addressees. Thus, we cannot say that the governmental interest asserted here is without rational foundation.

The district court's evidentiary findings, however, in this case establish that limiting the inspection of inmate mail to a search for contraband did not damage jail security.

Prior to the filing of this suit, the chief jailer enforced a policy of opening and reading each item of mail which was transmitted between prisoners and the outside. The stated purpose of this procedure was to insure security and to prevent the transmission of contraband. The jailer in charge of this procedure would read all of the inmate mail and had authority to refuse to send those letters which he found unacceptable for outside mailing. If there was matter in the letters which did not meet his approval, the jailer returned the letter to the inmate for rewriting. All letters had to be submitted to the jailer unsealed.

The first action taken in the present case was to enjoin the Sheriff from continuing this procedure as it applies to certain categories of mail. The inspection of the mail between the inmates and the persons or agencies set out in the order is now limited to superficial examination for possible contraband.

---

**21.** The inhibitory effect need not approach the certainty of that generated by prison practices in *Carothers v. Follette,* 314 F.Supp. at 1022–1023. There, disciplinary proceedings were brought against a prisoner for allegedly making false statements to a court about prison conditions after the inmate sent a letter to a judge about alleged harassment of inmates. Even if there is no imminent threat of official disciplinary action or informal reprisal, a prisoner may suspect that full discussion of defense matters or prison conditions in correspondence with attorneys, courts, or the other enumerated parties will either harm his defense, damage the prospects of civil rights or other litigation, or cause prison officials to look unfavorably at him.

The testimony of Chief Rowland revealed that since the first of the year his department has stopped the censorship of all mail and has limited its inspection to merely discovery of money or contraband which could be transmitted. In his opinion, the practice of censorship of the mail had little impact on the security of the jail.

344 F.Supp. at 414.

The district court's original findings were not, of course, set in granite. If conditions at the jail suggested that the reading of incoming inmate mail from these legal sources is essential to jail security, then the actual or anticipated abuses of mail should have been factually established. The appellants, however, do not assert that they requested an evidentiary hearing when the district court reconsidered the mail regulations on remand. They argue that the trial judge was adequately aware of attempts to smuggle contraband into the jail through use of official looking envelopes.

We find that the appellants have not made a persuasive showing that abuses of incoming mail pose a realistic threat to jail security or any other legitimate governmental interest that is cured by reading this mail or having the ability to do so. The actual abuses cited in the appellants' briefs involve contraband, not information contained in letters that can be discovered only by reading them. Thus, the abuses allegedly cured by the reading, perhaps selectively, of inmate mail are hypothetical.

Lacking support in the record the appellants seek to extend the permission given in *Wolff* to inspect mail from prisoners' attorneys for contraband to allow the reading of all correspondence from the enumerated sources. This extension, however, does not, as they argue, automatically follow.

The security threat that reading prevents is the transmission of information about criminal activities, rather than the infiltration of contraband into the jail. But prison officials treat opportunities to exchange illicit information differently from chances to introduce contraband into the jail. During jail visits physical partitions, visual monitoring, or other procedures typically are used to prevent the receipt of contraband by inmates. The common practice, however, is to allow unmonitored conversations between inmates and visitors, including attorneys. *See Procunier v. Martinez*, 416 U.S. at 425, 94 S.Ct. at 1817, 40 L.Ed.2d at 247 (Marshall, J., concurring); *Palmigiano v. Travisono*, 317 F.Supp. at 791. We have difficulty reconciling this practice with the concern that correspondence with sham legal correspondents threatens jail security. In the rare instances when the subterfuge is successfully executed, the tactical advantage over direct or third party transmittal of illegal information is difficult to perceive. We conclude that the appellants have not carried their burden of demonstrating that it is essential to read this mail in order to prevent the use of purportedly legal correspondence to lay plans for unlawful schemes. *Cf. Wilkinson v. Skinner*, 2 Cir. 1972, 462 F.2d 670, 671.

Of equal importance is the fact that the reading of this correspondence is the sole activity which diminishes an inmate's access to the courts by inhibiting written communications with certain correspondents. External tests for contraband, such as fluoroscoping or manipulating the envelope, do not have this effect. *See Marsh v. Moore*, 325 F.Supp. at 395. As Justice Marshall noted in *Wolff*, neither does inspecting an envelope for contraband in the presence of the inmate without reading enclosed materials. 418 U.S. at 580, 94 S.Ct. at 2986, 41 L.Ed.2d at 965 (dissenting). Allowing the inspection of incoming inmate mail from these sources only in the presence of the inmate accomplishes a compromise of two important interests without sacrificing either of them. Prisoners are not inhibited in using this traditional communication medium to pursue their defense or to present their legal grievance. And jail officials are not denied the use of any mail procedure shown to be essential to jail security.

Furthermore, our holding comports with several recent decisions in this circuit. In

*Frazier v. Donelon*, E.D.La.1974, 381 F.Supp. 911, 918–919, *aff'd per curiam*, 5 Cir. 1975, 520 F.2d 941 (unpublished), *cert. denied*, —— U.S. ——, 96 S.Ct. 1134, 47 L.Ed.2d 332 (No. 75–5905, 1976), the district court held that outgoing inmate mail to courts and attorneys could not be opened or read. Incoming mail from these sources was to be opened only in the presence of the prisoner, but not read. To obtain this treatment for their correspondence with prisoners, attorneys were required first to notify prison officials of the existence of an attorney-client relationship.

The *Frazier* approach to an inmate's legal correspondence closely follows the district court's handling of this problem in *Guajardo v. McAdams*, S.D.Tex.1972, 349 F.Supp. 211, and *Lamar v. Kern*, S.D.Tex. 1972, 349 F.Supp. 222. In both cases, the district judge required that outgoing inmate mail to courts, attorneys, and government agencies be uncensored and undelayed.[22] Incoming mail from these sources could be opened only in an inmate's presence. The envelope could be confiscated to inspect for concealed drugs, but the correspondence was not to be read beyond a check to insure that the signature was that of a special correspondent. These restrictions on the handling of inmate legal correspondence were grounded on the inmates' First Amendment rights to petition for the redress of grievances and on their Sixth and Fourteenth Amendment rights to effective assistance of counsel. Moreover, the court explicitly acknowledged the role of effective assistance of counsel in the exercise of a prisoner's right of access to the courts. Again, it is the latter right that we feel most forcefully underpins our holding.

**(2) PETITIONING FOR REDRESS OF GRIEVANCES AND FREE EXPRESSION**

We turn next to the limitations placed by the district court on the handling by jail officials of prisoner correspondence with government agencies and the press. Earlier we observed that the district court's most apparent concern in setting down its original and revised paragraph 4 was to protect prisoners' access to the courts. But our analysis of the import of that right in this case did not include consideration of mail between inmates and these two categories of inmate correspondents. The rationale for this exclusion is that, despite the possible connections between government agencies or the press and inmates' access to the courts, more definite First Amendment rights are implicated by the opening and reading of mail between inmates and these correspondents.

Our decision necessitates an assessment of the First Amendment rights of the pretrial detainees and convicted inmates who are the appellees in this case. Judicial authority for finding that these rights accrue to prisoners in the context of jail procedures for handling their mail is abundant. In *Martinez*, the Supreme Court explicitly rested its invalidation of prison regulations allowing broad censorship of inmate correspondence with the general public on the First Amendment rights of inmates' correspondents to freedom of speech. 416 U.S. at 408–409, 94 S.Ct. at 1808–1809, 40 L.Ed.2d at 237–238. Although the majority opinion declined an evaluation of the free speech rights of prisoners, three Justices did so in concurring opinions. Justice Marshall, in his concurring opinion, chose to follow a majority of courts which have decided the availability and extent of free speech pro-

**22.** In *Battle v. Anderson*, E.D.Okl.1974, 376 F.Supp. 402, 434, the district court required that the confidentiality of any inmate's outgoing correspondence to attorneys, courts, or government agencies be maintained. It further held that incoming mail from these sources could only be opened in the presence of the inmate and without delay or reading.

**23.** Numerous courts in other circuits have recognized the First Amendment rights of prisoners to free speech or to petition the government for redress of grievances. *See, e. g., Morales v.*

*Schmidt*, W.D.Wis.1972, 340 F.Supp. 544, rev'd, 7 Cir. 1973, 489 F.2d 1335, rev'd en banc, 1974, 494 F.2d 85, 87; *Sostre v. McGinnis*, 442 F.2d at 199; *Nolan v. Fitzpatrick*, 1 Cir. 1971, 451 F.2d 545, 547; *LeVier v. Woodson*, 10 Cir. 1971, 443 F.2d 360; *Jones v. Wittenberg*, N.D. Ohio 1971, 323 F.Supp. 93, 98; 330 F.Supp. 707, 719, *aff'd sub nom., Jones v. Metzger*, 6 Cir. 1972, 456 F.2d 854; *Palmigiano v. Travisono*, 317 F.Supp. at 788; Comment, *Prisoners' First Amendment Rights*, 70 Nw.U.L.Rev. 352, 353–56 (1975); Note, *Prison Mail Censorship*

tections for prisoners in regard to interference with their mail.[23] 416 U.S. at 423, 94 S.Ct. at 1816, 40 L.Ed.2d at 245. He would have found that "prisoners are . . . entitled to use the mails as a medium of free expression not as a privilege, but rather as a constitutionally guaranteed right". *Id.*

■ This circuit has previously recognized the free speech rights of prisoners in relation to prison restrictions on their mail. In *Jackson v. Godwin*, 5 Cir. 1968, 400 F.2d 529, censorship practices at the Florida State Prison restricting the ability of black inmates to receive black-oriented publications were held unconstitutional on free speech and equal protection grounds. That case clearly established the right of prisoners to enjoy the "preferred" freedoms of the First Amendment.[24] *Id.* at 535.

The First Amendment standard enunciated in *Jackson* for testing prison restrictions on inmate access to black publications was twofold. First, prison authorities "must strongly show some substantial and controlling interest which requires the subordination or limitation" of a prisoner's First Amendment rights and "which justifies their infringement". 400 F.2d at 541. Second, those officials must demonstrate that legitimate government goals are achieved by the least restrictive, alternative means. Significantly, the *Jackson* Court expressly adopted the formula for assessing the boundaries of free speech protections propounded in *United States v. O'Brien*, 1968, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. That formulation is, broadly speaking, the one applied in *Procunier v. Martinez* to prison regulations authorizing the censor-

ship of inmate mail. *See* 416 U.S. at 410–413, 94 S.Ct. at 1809–1811, 40 L.Ed.2d at 238–240.

Our use of this standard to adjudicate the First Amendment rights of prisoners is reconcilable with the Supreme Court's opinion in *Pell v. Procunier*, 1974, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495. The Court stated that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system". *Id.* at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501. It then proceeded to balance the First Amendment interests of inmates in face-to-face interviews with journalists against the legitimate governmental interests related to the incarceration of the plaintiff-convicts.

The Court held that the ban on press interviews with specific inmates did not violate the First Amendment freedoms of the prison inmates. Its review of the competing interests revealed that the ban on interviews furthered the interests of prison rehabilitation and jail security, while having only a minimal impact on inmate communication with the press. Prisoner rehabilitation was advanced by limiting visitations to individuals with a personal or professional relationship to the inmate. The ban also allowed maintenance of a level of visitation that was conducive to prison security.[25] On the question of the prisoners' interest in press interviews, the Court relied heavily on the availability of alternative means of communication, such as correspondence between prisoners and journalists, to demonstrate that this limitation on prisoner expression was of small consequence.[26]

---

*and the First Amendment,* 81 Yale L.J. 87 (1971).

**24.** A prisoner's freedom of religion under the First Amendment is a well established right that affords protection to correspondence of a religious nature. *See, e. g., Cruz v. Beto,* 1972, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263; *Cooper v. Pate,* 1964, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030; *Brown v. Peyton,* 4 Cir. 1971, 437 F.2d 1228; *Walker v. Blackwell,* 5 Cir. 1969, 411 F.2d 23; *Long v. Parker,* 3 Cir. 1968, 390 F.2d 816.

**25.** The prison restriction on interviews with prisoners specifically designated by press representatives was instituted in 1971. The catalyst for the ban was an occurrence of prison violence that state officials felt was partly caused by the previous policy of allowing interviews with prisoners designated by members of the press. *Pell v. Procunier,* 417 U.S. at 831, 94 S.Ct. at 2808, 41 L.Ed.2d at 506.

**26.** *See also The Supreme Court, 1973 Term,* 88 Harv.L.Rev. 43, 165–73 (1974). The Court also stated that the numerous alternative means of prisoner communication, together with the broad access to prisons afforded the press and

In *Pell*, the Supreme Court was not confronted with the competing interests at stake here. The appellants do not assert that prisoner rehabilitation is facilitated by reading their correspondence with government agencies or the press. They contend that jail security alone necessitates this practice.

A more important difference between *Pell* and this case is that here we are dealing with correspondence rather than with press interviews. A press interview conducted in a prison with a specific inmate is an extraordinary mode of communication. Correspondence with government agencies and the press is, to the contrary, a singularly common means of communication. As Justice Holmes described this activity: ". . . the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." *United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson*, 1921, 255 U.S. 407, 437, 41 S.Ct. 352, 363, 65 L.Ed. 704, 720 (dissenting). Moreover, there is now strong authority that a right to send and receive mail exists under the First Amendment. *See Blount v. Rizzi*, 1971, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498; *Lamont v. Postmaster General*, 1965, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398. *See also* Sigler, *Freedom of the Mails: A Developing Right*, 54 Geo.L.J. 30 (1965); 79 Dic.L.Rev. 352, 361 (1975). This Court has similarly held that federal statutes affecting communications sent by mail are constitutional only if narrowly drawn so as not to interfere with protected speech. *Hiett v. United States*, 5 Cir. 1969, 415 F.2d 664, *cert. denied*, 1970, 397 U.S. 936, 90 S.Ct. 941, 25 L.Ed.2d 117. In this perspective we believe it proper to apply the First Amendment analysis enunciated in *Procunier v. Martinez* to adjudicate the free expression and petition rights of the inmate-plaintiffs related to their correspondence with government agencies and the press.

■ We first apply the *Martinez* standard to the portion of the district court's order affecting prisoner correspondence with government agencies. The appellants contend that they may open, inspect, and read all mail transmitted between prisoners and those agencies to maintain jail security. That interest is, unquestionably, a substantial governmental interest unrelated to the suppression of expression. Two other commonly asserted interests, i. e. jail order and discipline, are largely derivative from this basic concern. Our initial inquiry, however, is whether opening and reading of inmate correspondence with government agencies furthers the interest of jail security. *See Procunier v. Martinez*, 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240. We hold, based on our earlier discussion of outgoing inmate mail, that the opening and reading of outgoing mail to government agencies is not significantly related to the advancement of jail security. Our decision, of course, in no way restricts the ability of prison authorities to ascertain whether this mail is addressed to the correct address of a government agency or to stamp inmate envelopes with language alerting government employees to report abusive correspondence.

■ With respect to incoming mail from government agencies, there is a more realistic threat to jail security. The danger presented by this mail is that physical contraband [27] will enter the jail. It is essential that prison officials have the discretion to open and inspect envelopes from any source when they feel that external screening is

---

the public in California, satisfied whatever right the inmates have to petition the government through the press. 417 U.S. at 828 n.6, 94 S.Ct. at 2807, 41 L.Ed.2d at 505.

27. Physical contraband, such as weapons, metal files, or drugs, can ordinarily be detected by manual manipulation of envelopes, by scanning with fluoroscopes and metal detectors, or by inspection in the inmate's presence. *See*

*Marsh v. Moore*, 325 F.Supp. at 394–95; Note, *Attorney-Prisoner Communications: The Right to Uncensored Mail*, 1 Am.J.Crim.L. 28, 39 (1972); 86 Harv.L.Rev. 1607, 1616 (1973). For a discussion of the types of physical contraband commonly found in prisons, see Guenther, *Compensations in a Total Institution: The Forms and Functions of Contraband*, 21 Crime & Delin. 243 (1975).

insufficient to detect contraband. We again note that the Supreme Court's language in *Wolff v. McDonnell,* 418 U.S. at 577, 94 S.Ct. at 2985, 41 L.Ed.2d at 963, supports this result.

Our assessment of the threat posed by written communications about illegal activities in mail *from* courts, identifiable attorneys, prosecuting attorneys, and parole or probation officers is equally applicable to this category of correspondent. We hold, therefore, that the practice of reading this mail fails to satisfy the second criterion laid down by the *Martinez* Court. That practice is not essential or necessary to the interest of jail security. Government agencies are no more likely than courts and the other parties covered by our right of access analysis to generate abusive mail. This category of incoming mail is to be treated in accordance with the procedures for mail from legal correspondents set out in section B(1).

Finally, we must consider inmate correspondence with the press.[28] It is possible, of course, to approach this question from the standpoint of the First Amendment interests of either inmates or members of the press. We assess only the inmates' interests because of the special nature of this controversy.

Paragraph 4 of the district court's original and revised orders was primarily directed to protecting the prisoners' access to the courts by fostering uninhibited mail communications. But since correspondence with the press is not directly connected to that access, we view the role of this correspondence in the context of this case as being primarily related to the prisoners' interests in free expression and in petition-

ing the government for the redress of grievances.

In the proper circumstances these prisoner interests are manifested in rights that are protected against governmental interference. The first question to be asked in adjudicating these rights is whether a prison practice or rule significantly impinges on the prisoners' free speech and petition interests. For example, in *Pell* the Supreme Court recognized that convicted inmates had free expression and petition interests in personal interviews with press representatives. *See* 417 U.S. at 821–828 and n. 6, at 2803–2807, 41 L.Ed.2d at 500–505. Its analysis, however, strongly implied that the ban on interviews with designated prisoners did not, against the background of adequate alternative means of communication with the press, amount to significant abridgements of those interests. The *Pell* Court stressed the role of the unrestrictive mail policies of the California prison system in facilitating alternative communication media available to prisoners. That circumstance minimized the importance of face-to-face prison interviews to inmates and members of the press.

The role of correspondence in effective inmate communications is also a vital factor here. Earlier, we observed that correspondence is a principal method available to prisoners to communicate with private and public individuals or entities. Written correspondence occupies this position because it entails a relatively small utilization of prison and prisoner resources to accomplish its communicative purpose. Jail practices which inhibit this medium therefore create a serious impediment to a prisoner's communicative capability.[29]

---

**28.** The term "press" was undefined in the district court's orders. To lend clarity to this discussion we adopt the following definition of representatives of the press which is used by the Federal Bureau of Prisons:

Persons who are substantially employed in the business of gathering or reporting news for (a) a newspaper qualifying as a general circulation newspaper in the community to which it publishes, (b) news magazines having a substantially national circulation being sold by newsstands to the general public and by mail circulation, (c) national or interna-

tional news services (d) radio and television news programs of stations holding Federal Communication Commission Licenses.

U.S. Dept. of Justice, Bureau of Prisons, Policy Statement No. 1220.6/7300.96, Inmate Correspondence Interviews With Representatives of the Press and News Media, § 4(a)(1), June 10, 1974.

**29.** Even if many prisoners are functionally illiterate, as suggested by Justice Powell in *Saxbe v. Washington Post Co.,* 1974, 417 U.S. 843,

■ From our previous analysis it is apparent that the interest of jail security necessitates that incoming mail from the press may be inspected for contraband. The reading of inmate correspondence with the press, whether outgoing or incoming, is a different question. The press, collectively and individually, is not analogous to the persons or agencies discussed to this point. It does not have the legal responsibilities and obligations of various governmental officials and agencies. And, the distinctive ethical standards attorneys are held to do not apply to the press. We cannot say, therefore, that the reading of outgoing inmate correspondence to the press does not further a substantial governmental interest. Transmitting unread mail to supposed members of the press could be used as a subterfuge for discussing illegal activities. The same danger exists, of course, with respect to incoming mail of this kind.

This does not end our inquiry. Since the free expression and petition interests of the inmate-plaintiffs are operative in this case, the practice of reading this mail must be essential to jail security. The appellants, however, have not demonstrated that alternative methods of eliminating the danger posed by this mail are unavailable. We think that treatment of this correspondence under procedures similar to those applying to inmate-attorney mail satisfies this government interest without impinging upon the inmates' free expression and petition interests.

First, outgoing prisoner mail to press representatives may not be opened or read. Prison officials should be allowed a maximum of 48 hours to ascertain that a press to write falls within our definition of the press. Inmates are limited to addressing this mail to the business office of a press representative. It is not difficult to compile a list of the business addresses of local and state press officials to check the authenticity of an address used by a prisoner. Mail addressed to out-of-state press offices should not occur in a volume which burdens unduly prison administration resources.

Incoming mail from the press should be inspected for contraband only in the presence of the inmate.[30] Press representatives wishing to correspond with inmates may be required to identify themselves and their status in writing before their unread mail is distributed to prisoners. This requirement substantially reduces whatever risk exists that unread letters from supposed press sources may damage prison security.

II

"COP–OUT" SYSTEM

We stated upon review of the district court's original order that the provisions of paragraph 8 were overly restrictive. 499 F.2d at 369. Those provisions required the Sheriff to limit the visits of "cop-out"[31]

854–855, 94 S.Ct. 2811, 2817, 41 L.Ed.2d 514, 522 (dissenting), correspondence through the mail remains important to all prisoners. Incoming mail can certainly be read to them. And, the fact that some prisoners cannot write does not prevent them from seeking the aid of others in producing legal or non-legal writings. The circumstance that many or all means of communicating while in a prison are relatively ineffective does not justify a reduction of the means of access to the attention of others. If anything, this circumstance lends a sense of urgency to safeguards which decrease a prisoner's reluctance to express himself fully to outside parties, particularly those from whom lawful assistance or remedies may be forthcoming.

30. In *Saxbe v. Washington Post Co.*, 417 U.S. at 847, 94 S.Ct. at 2813, 41 L.Ed.2d at 518, a companion case to *Pell v. Procunier*, the Supreme Court observed that a Federal Bureau of Prisons policy permits outgoing inmate mail to the press that is uncensored and uninspected. Incoming mail from the press may be inspected only for contraband or statements inciting unlawful activity.

31. This term refers to representatives of the district attorney's office who visit inmates in the Dallas County Jail for various purposes. In addition to discussing plea bargains they may question inmates about ongoing criminal investigations. The original findings of fact by the district court relating to the "cop-out system" are as follows:

The investigators, called cop-out men, are individuals hired by the District Attorney and assigned to particular State courts. Their chief role is to work out an agreeable recommendation for punishment to be presented by the District Attorney if the inmate pleads

men to those prisoners who had asked or consented to see these representatives of the district attorney's office. "Upon remand we suggest[ed] that an effort be made specifically to limit this requirement to the evil it is intended to extirpate, if that evil does, in fact, rise to constitutional dimensions."[32] *Id.*

The district judge on remand revised paragraph 8 by adding clarifying language indicating that the restrictions were not intended to eliminate plea bargaining or any legitimate functions performed by the district attorney's representatives in their visits to prisoners. The revised paragraph 8 states that plea bargaining is merely to be limited, apparently by restricting the visits of cop-out representatives to prisoners who consent in advance to see them.

The appellants object to the revised paragraph 8 on several grounds. They note first that the district court did not enunciate a constitutional justification for the restrictions it places upon the Sheriff. In light of the practice of properly administered plea bargaining, *see Santobello v. New York*, 1971, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427, the appellants assert that any restrictions on the plea bargaining process should be supported by a substantial constitutional reason. They further argue that the plaintiff-prisoners at most vaguely allege that the plea bargaining procedures of the district attorney's office violate the prisoners' constitutional right to counsel.

The appellants' arguments are well grounded. A constitutional reason for placing the limitations of the revised paragraph 8 on the appellants must be articulated. Our review of the pleadings, previous opinions and records in this case, and briefs of the parties in this appeal reveals that the constitutional issue regarding the cop-out system is not adequately defined. We therefore vacate paragraph 8 of the district court's November 1974 order and remand for further consideration.

The district court should bring the constitutional question into focus by making findings as to alleged abridgements of prisoners' rights that may be caused by the operation of the cop-out system. It should also make findings as to the reasonableness of requiring the appellants, particularly the Sheriff, to control the plea bargaining portion of the activities of the district attorney's representatives in the Dallas County Jail. The district attorney is not a party to this suit. The district court may in its discretion take further testimony and hear argument on these issues. Our next review of its adjudication of these questions, if there is an appeal, will necessitate greater factual information than is available to us in this appeal.

Finally, we add two observations. The appellees' intimation that this system has a coercive effect on the plea bargaining decisions of pre-trial detainees warrants scrutiny. *Cf. Anderson v. Nosser*, 5 Cir. 1971, 438 F.2d 183, *aff'd in pert. part*, 456 F.2d 835

---

guilty. As a matter of policy, the investigators will not discuss a plea or punishment with an inmate who has a lawyer unless the lawyer is present. If the inmate has no lawyer, the cop-out man interviews him, regardless of whether the inmate has requested the interview. Although the investigators are not part of the Sheriff's staff, they are given relatively free access to the jail and the inmates. The plaintiffs have asked that the Sheriff be enjoined to restrict the access of cop-out men to the prisoners except when the prisoner makes a specific request for an interview.

344 F.Supp. at 416.

**32.** The Court stated:

As a general proposition we agree that prisoners should be left free of unwanted visitors, contacts, or importunities. Yet, we are of the view that the provisions of Paragraph 8 are too restrictive, especially since the primary jurisdiction of the federal courts in this area is limited to the vindication of rights guaranteed by the federal constitution. Conceivably, the order would eliminate visits from official investigators engaged in efforts to solve crimes or to perform other legitimate duties. As to prisoners who choose not to be represented by counsel or who, as indigents, are charged with such misdemeanors as not to require counsel, this order could block efforts to bring their cases to a speedy resolution.

499 F.2d at 368–369.

**484**

(en banc), *cert. denied*, 1972, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89. The district court, however, should analyze the effects of the cop-out system against the background of protections afforded pre-trial detainees in the plea bargaining process. *See, e. g., Santobello v. New York, supra; Bouchillon v. Estelle*, 5 Cir. 1975, 507 F.2d 622 (Rives, J., specially concurring); *United States v. Ross*, 5 Cir. 1974, 493 F.2d 771.

PARAGRAPH 4 OF THE DISTRICT COURT'S ORDER IS THEREFORE AFFIRMED AS MODIFIED. PARAGRAPH 8 OF THAT ORDER IS VACATED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.